UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI, ex rel. | ) | |
| Chris Koster, MISSOURI DEPARTMENT | ) | |
| OF NATURAL RESOURCES, | ) | |
| MISSOURI STATE EMERGENCY | ) | |
| MANAGEMENT AGENCY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:11CV00067 SNLJ |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, MAJOR GENERAL | ) | |
| MICHAEL WALSH, COLONEL VERNIE | ) | |
| L. REICHLING, JR., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Intervenor Defendant, | ) | |
| | ) | |
| | ) | |
| COMMONWEALTH OF KENTUCKY, | ) | |
| | ) | |
| Intervenor Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

Historic floods are occurring in southeast Missouri, southern Illinois, and western

Kentucky. The United States Army Corps of Engineers has sent a barge filled with explosives to

the levee at Birds Point, Missouri, with the intention of activating plans to use the Birds Point-

New Madrid Floodway (the "Floodway") in Mississippi and New Madrid Counties to ease

flooding of the Mississippi River. This can be accomplished by intentionally crevassing the levee

and thereby diverting the floodwaters to approximately 130,000 acres of private and public

property within the Floodway.  On April 26, 2011, the State of Missouri and the Missouri

Department of Natural Resources filed this action seeking to enjoin the Corps from activating the

Floodway.  The State of Illinois and the Commonwealth of Kentucky sought and were granted

permission to intervene on the side of the Corps.  The Court received multiple memoranda and

voluminous exhibits from all parties and held an evidentiary hearing on April 28, 2011.

**I.        Factual Background**

The testimony and other evidence about the Birds Point-New Madrid Floodway

Operations Plan (the "Plan") are largely undisputed, and are summarized as follows:

The Mississippi River and Tributaries Project (the "MR&T Project") was authorized by

Congress pursuant to the Flood Control Act of May 15, 1928, *Story v. Marsh*, 732 F.2d 1375,

1378 (8th Cir. 1984), in response to the devastation created by the Great Mississippi River Flood

of 1927. The MR&T Project was designed to protect against other tragic floods while also

enhancing navigation in the Mississippi River.  The goal of the Project, in particular, was to

withstand and control a flood of greater severity than the last great flood of record.  The current

model, known as the "Project Design Flood," was first developed in 1954 and has been revisited

repeatedly since.

The heart of the MR&T Project is a 3,787-mile levee system, part of which is the Birds

Point-New Madrid Floodway.  The Floodway encompasses most of Mississippi County,

Missouri, and parts of New Madrid County, Missouri, and covers over 130,000 acres.  The

Floodway, located just below the confluence of the Ohio and Mississippi Rivers, is bounded by

two levees.  One levee — the frontline levee — follows the western bank of the Mississippi

River over approximately 40 miles starting upstream at a point across the River from Cairo,

Illinois, and ending just upriver from New Madrid, Missouri. Between these two cities, the River forms a wide arc. The second levee — the setback levee — is fairly straight and connects the two ends of the arc, creating an open area between the two levees that is about 30 miles long and is, in places, more than ten miles wide. (See maps attached as Exhibit 1 and 2.) The frontline levee is 62.5 feet; the setback levee height is 65.5 feet. However, certain sections of the frontline levee — the upper and lower fuseplugs — are 60.5 feet, and a 1,500 foot gap exists at the southern portion of the frontline levee to allow drainage and backflow into the Floodway. The area inside the Floodway, although mostly farmland on which corn, soybeans, wheat, cotton, rice, and other crops are grown, also has approximately 90 homes and roughly 200 residents.[1]

The Plan as it exists today was last revised in 1986. When the River is at approximately 60 feet on the river gage at Cairo, the Corps will mix a blasting agent, pump the agent into levee pipes, and detonate crevasses into the northern side of the frontline levee at the "upper fuseplugs." This "artificial crevassing" is intended to direct floodwaters into the Floodway, where, after the floodwaters have reached the southern edge of the Floodway and begun to overtop the lower fuseplug, another artificial "outflow crevasse" will be created at that lower fuseplug to allow for outflow of the water back into the Mississippi River.

Because of the current flooding, the Corps announced that it intends to artificially crevasse the frontline levee in order to implement the Plan if the Cairo river gage reaches 61 feet. On the morning of the hearing on this matter, the Cairo river gage read 58.67 feet. Naturally, it takes several days to move the necessary explosives into place and to take the other steps needed

---

[1]Notably, that same area contained 330 residences and 1,300 people when this matter was last litigated in 1984. *Story v. Marsh*, 732 F.2d 1375, 1378 (8th Cir. 1984).

to artificially crevasse the frontline levee.  Although the Corps has sent a barge containing the

necessary explosives upriver, the President of the Mississippi River Commission — defendant

Major General Michael J. Walsh — has yet to decide whether to artificially crevasse the levee.

Even after the explosive material has been pumped into the levee pipes, the Corps may choose

not to "blow the levee," in which case the explosives would be pumped out of the pipes, hauled

away by specialized vehicles, and destroyed.

The Project Design Flood — or the flood model on which the Operational Plan is based

— is defined by river flows of 2,360,000 cubic feet per second ("cfs").  Under current flood

conditions, the River is flowing at approximately 2,300,000 cfs, a level of pressure that has never

been experienced and that creates a high risk that weak spots in the MR&T Project system will

be exposed.  Operating the Floodway will divert 550,000 cfs of floodwaters — or one quarter the

total flow of the Mississippi River — into the Floodway, creating a "safety valve" that is critical

to the MR&T Project's safety conditions.  All of the MR&T system's 3,787 miles of levees are

designed on the assumption that the Floodway will be efficiently and timely utilized.

Notably, the area that encompasses the Floodway is subject to 80,892 acres of flowage

easements, most of which were acquired many years ago with the authority of the United States

Congress.[2]  Under those easements, the landowners released and held harmless the United States

---

[2]Plaintiffs do not take issue with the fact that flowage easements have not been granted
for all 130,000 acres of the Floodway.  Indeed, the Eight Circuit has already held that "even if the
government has failed to obtain the necessary easements, injunctive relief barring operation of
the Floodway is not the appropriate remedy for such a failure. The landowners have an adequate
remedy at law [for damages] under the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491." *Story*,
732 F.2d at 1384.  According to the Declaration of Major General Michael Walsh, "[t]he only
lands where easements were not acquired were lands subject to natural flooding from the
Mississippi River."

for any and all damages that occur as the result of flooding.

At the time of the hearing, sixty percent of the Floodway is already flooded with "backwater flooding" that occurs when the River downstream backs up into a 1,500 foot gap in the levee on the southern edge of the Floodway. One of plaintiffs' witnesses, Milus Wallace, lives on and owns 2,300 acres in the Floodway. Currently, the backwater has already flooded Wallace's entire property, but he testified that a levee breach (including an artificial levee breach) would damage his property to a far greater extent than what has occurred as the result of backwater flooding. However, Wallace also testified that his property was subject to the flowage easement, and that the easement had been on the deed when he purchased his property.

Finally, plaintiffs maintain that the Floodway area contains petroleum storage tanks, farm chemical storage buildings, and LP gas tanks, and that the flooding caused by blowing the levee will release those and other contaminants into the environment. Plaintiffs' witnesses testified that, consistent with Plan § I(C)(2), the state had advised Floodway residents to evacuate the area and move farm chemicals and other pollutants to safe locations. Wallace testified that he had already done so. However, another plaintiffs witness, Davis Minton, Deputy Director of Operations with the Missouri Department of Natural Resources, testified that he knows of residents who are unable to move their stored petroleum products due to the backwater flooding.

## II.      Legal Standard

To determine whether preliminary injunctive relief is warranted, the Court must balance the threat of irreparable harm to the movant, the potential harm to the nonmoving party should an injunction issue, the likelihood of success on merits, and the public interest. *Dataphase Sys. v. CL Sys.*, 640 F.2d 109, 113-14 (8th Cir. 1981) (*en banc*). The "burden of establishing the

propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

**III.    Discussion**

Plaintiffs' complaint contains three counts: (I) The Plan would cause unlawful pollution of water under the Missouri Clean Water Act, § 644.076 RSMo; (II) the Plan is unlawful under the Administrative Procedures Act, 5 U.S.C. § 706; and (III) the Corps' implementation of the Plan is unlawful under the APA.  Plaintiffs' motion, however, does not address Count II, so the Court will focus solely on plaintiffs' arguments under Counts I and III.

**A.    Count I**

Plaintiffs maintain that the floodwaters released in the Floodway if the levee is breached by explosives under the Plan will constitute a violation of Missouri's Clean Water Act, as set out in Chapter 644, RSMo 2004.  Specifically, plaintiffs claim that "Defendants' breach of the frontline levee will cause pollution to waters of the state of Missouri and will place or cause or permit to be placed water contaminants in a location where they are reasonably certain to cause pollution of waters of the state of Missouri in violation of § 644.051.1(1)."  In general, however, an agency of the federal government, such as the Army Corps of Engineers, is immune from suit under the doctrine of sovereign immunity unless there has been a waiver of sovereign immunity. *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986).  Moreover, it is well-settled that waivers of sovereign immunity must be unequivocally expressed by Congress, that they may not be implied, and that they must be strictly construed in favor of the United States. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 686 (1983).

To establish the necessary waiver, plaintiffs invoke Section 313(a) of the federal Clean

Water Act, 33 U.S.C. § 1323(a), which states:

> (a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law . . . .

Although on its face, this section authorizes suits against federal agencies for violations of state clean water acts, Section 511(a) of the federal Act sets out exceptions to that authorization, stating in pertinent part that, "This chapter shall not be construed as . . .(2) affecting or impairing the authority of the Secretary of the Army (a) to maintain navigation. . . ," 33 U.S.C. § 1371(a), which is a direct reference to the Corps' statutory responsibilities to maintain navigation on the nation's navigable waterways. This exception is implicated, according to the defendants, because the design and implementation of the Plan encompasses not only flood control along the Mississippi River, but also maintenance of navigation on the River, and as a result, plaintiffs cannot sue to enforce the alleged violation. This Court agrees.

At the outset, this Court is doubtful that the waiver of sovereign immunity in § 1323(a) applies at all to the Corps of Engineers, regardless of the stated exception for maintaining navigation. If indeed plaintiffs are correct that § 1323(a) operates to waive sovereign immunity,

then the Corps' statutorily mandated efforts to build and maintain levees for flood control on the nation's navigable waterways would be subject to the regulatory provisions of the clean water acts of each individual state. And if that is true, then § 1323(a) preempts and effectively eviscerates the core functions of the Corps under the federal Flood Control Act.

It is not necessary to resolve that question, however, because this Court finds that the "maintaining navigation" exception applies so that the general rule waiving sovereign immunity cannot be invoked. This finding is predicated in large part on the critical and uncontroverted testimony of David Berretta, a registered professional engineer whose official position is "Chief, Hydraulics and Hydrology Branch, Engineering and Construction Division of the Memphis District of the U.S. Army Corps of Engineers." Ultimately, in addressing the separate impact of the Plan on the navigation of the River, as opposed to flood control, Mr. Berretta made clear that implementing the Plan by blowing the levee if necessary would cause less damage to the navigability of the River than failing to implement the Plan. When asked specifically about the scenario that would occur if the Plan to blow the levee was *not* implemented and instead where natural flooding caused a breach in the levees, the following colloquy ensued:

Q      Would that affect navigation?

A      Yes, I believe so.

Q      Okay. How so?

A      The possibility of creating cutoffs or the river taking a short circuit.

Q      Okay.

A      Or the - - just by force of water to go in an uncontrolled direction may cause a channel to silt in or block up or something.

Q       And when you say silt and block up, what would that look like?

A       Well, the river carries so much sediment naturally, the velocity keeps that material suspended. If you - - if you divert water in a direction the river is not designed to carry, the velocities in the river could possibly be impacted to the point that the material would then settle out, typical of what we see in a dredging scenario during low river stages.

Q       How would that affect navigation on the Mississippi?

A       Block the navigation.

Q       Would it just block it during the duration of the flood?

A       I'm sorry?

Q       Would it just block it during the duration flood?

A       No, sir, it would take - - we would have to let flood subside and then it would take weeks or months probably to get things back in order.

Q       Depend on how severe it gets?

A       Yes, it is.

* * *

Q       Okay. So you discussed the possibility that even if the flood plain is utilized [under the Plan] there still may be damage to navigation?

A       Yes.

Q       Would operating the floodway [under the Plan] reduce the risk of that damage to navigation?

A       We believe so.

In addition to the testimony of Mr. Berretta, Major General Walsh testified by way of affidavit simply that "Should a levee that relies on Floodway operation fail, the River may have to be closed to navigation." Yet another Corps witness, Charles Camillo, testified at the hearing

that flood control and navigation are "tied together" so the river "won't meander."

Given this collective testimony, the Plan, at least in part, does in fact pertain to maintenance of the navigability of the River, and in view of the rule that waivers of sovereign immunity are to be strictly construed, this Court is compelled to hold that a waiver has not occurred in this case. Accordingly, as to Count I, plaintiffs have no likelihood of success on the merits of the case that would justify a temporary restraining order.

**B.      Count III**

Plaintiffs' claim under Count III is that the Corps' implementation of the Plan is unlawful under the Administrative Procedures Act, 5 U.S.C. § 706. In support, plaintiffs contend that "[o]ther flood control mechanisms can be employed to avert anticipated flooding," and that "the Corps' own plan, paragraph I.A., provides that the operation can only occur if 'absolutely essential' to protect all citizens." In addition, plaintiffs maintain, apparently relying on the standard of review set forth in the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), that "[t]he Corps' decision to explode the levee without considering other alternatives is arbitrary and capricious and is an abuse of discretion."

This Court is bound, however, by the 27-year-old precedent set by the United States Court of Appeals for the Eighth Circuit in *Story v. Marsh*, 732 F.2d 1375 (8th Cir. 1984) involving the very same Floodway as here. In *Story*, the Eighth Circuit held that "the decision of the Corps of Engineers to artificially crevasse both the upper and lower fuse plug sections and the frontline levee is an action 'committed to agency discretion by law' within the meaning of 5 U.S.C. § 701(a)(2) and that the substance of that decision is therefore unreviewable." 732 F.2d at 1379. The Court found that "[i]t is clear...that Congress authorized the raising of the levees and

the artificial breaching of the levees at any point when the water reached 58 feet on the Cairo

gage with a prediction that the water might exceed 60 feet." *Id.* at 1380-81.  Further, the Court

observed,

> Congress provided no additional standards for determining whether
> and where to crevasse the levee; it simply authorized the crevassing
> at any point on the frontline levee.  Congressional delegation in this
> instance is therefore very broad in scope; furthermore, the delegation
> requires the Corps to exercise considerable expertise in a highly
> technical area. In such circumstances, the courts have little, if any,
> standards against which to assess the agency decision, thus rendering
> the substance of the agency action largely unreviewable.

*Id.* at 1381.  The *Story* litigation is nearly identical to the matter before the Court, and the case

clearly holds that the Corps' decision to activate its Plan and artificially crevasse the levee is not

reviewable by this Court.  *Id.*

Even if this Court were permitted to review the *procedures* followed by the Corps under

these circumstances, that is, whether the Corps is following its own procedures, there is no

credible evidence that the Corps is not doing so.  To the contrary, this Court finds that the Corps

is committed to implementing the Plan "only as absolutely essential to provide the authorized

protection to all citizens."  Furthermore, this Court finds that no aspect of the Corps' response to

these historic floods suggests arbitrary or capricious decision-making is occurring.

Accordingly, as to Count III, plaintiffs have no likelihood of success on the merits of the

case that would justify a temporary restraining order.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the plaintiffs' Motion for Temporary Restraining

Order and Preliminary Injunction is **DENIED**.

Dated this __29th__ day of April, 2011.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE